## EDWIN WARFIELD, Governor of Maryland, *vs.* MURRAY VANDIVER.

*Bill Proposing Amendment to the Constitution Passed by the General Assembly Does not Require the Approval of the Governor—Proposed Amendment not Containing Distinct Legislation—Mandamus Directing Publication of Amendment.*

Art. 14 of the Constitution provides that "the General Assembly may propose amendments to this Constitution, provided that each amendment shall be embraced in a separate bill  *  *   and passed by three-fifths of all the members elected to each of the two Houses.   * * The bill proposing amendment shall be published by order of the Governor," etc.   Art. 3, sec. 1, declares that the Legislature shall consist of a Senate and House of Delegates and shall be styled the General Assembly of Maryland.   In other articles of the Constitution the words "General Assembly" are used in a sense which excludes the Governor. By Art. 2, sec. 17, it is provided that to guard against hasty or partial legislation and encroachments of the legislative department, every bill which shall have passed the House and Senate shall, before it becomes a law, be presented to the Governor.   If he signs it, it becomes a law. If he does not approve it, and it is passed by a three-fifths vote of the two houses over his veto, it also becomes a law.   *Held*, that a bill proposing an amendment to the Constitution, formulated by the General Assembly in the manner prescribed by Article 14, does not require the approval of the Governor before it can be voted on by the people, and that the Governor has no authority to veto such bill.

In 1904 the Legislature formulated an amendment to Art. 1 of the Consti-

tution relating to the elective franchise. Section 2 of the bill directed that the amendment be submitted to the voters of the State at the next general election, "and at said election the vote on said proposed amendment shall be by ballot, and upon each ballot there shall be written or printed the words, 'For the Constitutional Amendment,' or 'Against the Constitutional Amendment' as the voters shall elect." Art. 1 of the Constitution declares that all elections shall be by ballot. Code, Art. 33, sec. 56, enacts that when a constitutional question is submitted to popular vote, the question shall be placed upon the ballot in the form following, "For Constitutional Amendment," "Against Constitutional Amendment," in a space where the voter may indicate whether he shall wish to cast his ballot for or against the amendment. *Held*, that the second section of the bill proposing the amendment, relating to its submission to the vote of the people, does not contain such distinct legislation as to demand the approval of the Governor, since some of its provisions are those required by the Constitution and the other provisions are in accord with the existing enactments of the Code.

Another bill proposing an amendment to the Constitution provided that it should be submitted to the voters of the State "for their adoption or rejection, in pursuance of the directions contained in Art. 14 of the Constitution, and at the said general election the vote on said proposed amendment shall be by ballot, and upon each ballot shall be printed the words: 'For Constitutional Amendment' and 'Against Constitutional Amendment,' as now prescribed by law, and immediately after said election due return shall be made to the Governor of the vote for and against said proposed amendment as directed by said 14th Article of the Constitution." *Held*, that these provisions do not contain distinct legislation requiring the Governor's approval.

A *mandamus* will be issued to require the Governor to publish in the manner directed by the Constitution, Art. 14, a proposed amendment of the Constitution passed by a three-fifths vote of the General Assembly, and not containing essentially legislative provisions, although such proposed amendment had not, when passed as a bill, been submitted to the Governor for his approval.

Appeal from the Circuit Court for Anne Arundel County (Revell and Thomas, JJ.)

The cause was argued before McSherry, C. J., Fowler, Briscoe, Page, Boyd, Pearce, Schmucker and Jones, JJ.

*William S. Bryan, Jr., Attorney-General,* and *Edgar H. Gans,* for the appellant.

What we contend for is (supposing for the sake of the argument, the provision in Art. 14 for a modal regulation gov-

erning the submission to the people to be eliminated), that in Maryland a proposal to amend the Constitution must be passed with all the checks and safeguards which the Constitution provides for enacting a bill into a law. Not that the proposal itself is a law, but just as the Constitution prescribes that a bill shall be passed in a certain way to be a valid law, so a bill shall be passed in the same way before it can be validly submitted to the people in a proposal to amend the Constitution. The whole question is one of intention. Any examination of the cases on this subject will make it very clear that each Constitution is construed in accordance with its own phraseology, taken in connection with the history and policy of the particular State whose Constitution is being construed. The Constitutions differ very materially in the various States, and a decided case in one State construing its own Constitution would not have much authority in another State having a different provision in its Constitution, and a different history and policy. We insist upon this point, as most of the authorities cited by the appellee, as conclusive on this question can be readily distinguished on this ground alone.

Prior to the Constitution of 1851, all amendments to the Constitution were made by the General Assembly, by Act passed at one session, and by a confirmatory Act passed at the next session. There was no submission to the people. *Hinkley's Notes to Const.,* 1851; *Constitution of 1776,* secs. 59, 60.

By Art. 11 of the Constitution of 1851, the Legislature was required at its first session immediately succeeding the returns of every census of the United States, to pass a law for ascertaining at the next general election of delegates, the sense of the people in regard to the calling a convention for altering the Constitution. Under the Constitution of 1851, the law, to take the sense of the people, could not pass without the Governor's approval.

By the Constitution of 1864, Art. 11, it was provided:

"Section 1. *The General Assembly may propose* any amendment or amendments to the Constitution which shall be agreed

to by three-fifths of all the members elected to both Houses. Such proposed amendment or amendments, with the yeas and nays thereon, shall be entered on the journal of each House, shall be printed with the laws passed at the same session, and shall be published by order of the Government," etc.

"Section 2. *Whenever two-thirds of the members elected to* each branch of the General Assembly shall think it necessary to call a convention to revise, amend or change this Constitution, they shall recommend to the electors to vote at the next election for members of the General Assembly for or against a convention," etc.

Now, when the convention of 1867 met, it had these models before it. It will be seen how fully the Legislature and the Governor had part in making or proposing amendments. Before 1851, they had the whole power of making the amendment. By the Constitution of 1851, the two Houses and the Governor passed the law for ascertaining the sense of the people, and by the Constitution of 1864, the distinction between the two Houses, acting in conjunction with the Governor as "The General Assembly," and a simple concurrence of two-thirds of the members elected to each House in making a recommendation to the electors, was clearly marked.

By sec. 1, the General Assembly proposed, acting by three-fifths of its members, and their action was printed with the laws passed at the same session.

By sec. 2, the "General Assembly" do not act; two-thirds of the members of each branch were to act; their action was not to be printed with the laws; they were not acting as the General Assembly, but as men selected to make recommendations simply because their being in the General Assembly was supposed to give them special opportunity to pass upon the desirability of such a recommendation. They were selected just as a judge has sometimes been selected to appoint a school board, not because he is judge, but because he is a man who has shown that having been elected to so responsible position as judge, has intelligence, integrity and good judgment. So that in 1867, the distinction had been already

sharply drawn between the "General Assembly" acting as such, and a concurrence of individuals who happened to be members of the General Assembly; and that distinction has been stated in the prior Constitution by apt and expressive phraseology.

Now, it will be seen, as the argument progresses, that this distinction of itself differentiates most of the authorities cited by the appellee from other States from the case at bar.

A number of proposals have been made in Maryland to amend the Constitution of 1867.   The list follows :

   1.  1874, ch.  364.   Removal of cases.

   2.  1880, ch.  417.   Election of judges.

   3.  1890, ch.  194.   Art. 2, sec.  17.   Veto of distinct items of appropriation bills.

   4.  1890, ch.  195.   Art. 3, sec. 48.   Amending charters of corporations.

   5.  1890, ch.  242.   Art. 15.   D. of R. Taxation.

   6.  1890, ch. 255.   Art. 7, sec. 1.   Election of county commissioners.

   7.  1890, ch.  426.   Art. 3, sec. 51.   Situation of personal property for taxation.

   8.  1890, ch. 362.   Art. 12, sec. 3.   Sale of works of internal improvement.

   9.  1892, ch.  313.   Art. 4.   Additional Judge to Supreme Bench.

   10.  1896, ch.  459.   Art. 15.   Civil Service.

   11.  1900, ch.  185.   Art. 5, sec. 9.  Compensation of State's Attorney.

   12.  1900, ch. 432.   Art. 3, sec.  4.   Reapportionment of House of Delegates.

   13.  1900, ch. 469.   Art. 3, sec. 2.   Senatorial representation from city.

These are all the proposed amendments since the Constitution of 1867.   *In all of them without exception*, the proposed amendment was in the form of a bill, with a title, an enacting clause, a section containing the amendment as it would read as amended, another section containing a modal provision for

submission to the people.   They were all passed just as laws are passed, read three times, engrossed, had the great seal, were signed by the Governor' recorded with the Clerk of the Court of Appeals, and published with the printed laws.

This unbroken precedent gives us the strongest kind of legislative construction of Art. 14 of the Constitution.   All the cases hold that a continuous legislative construction has great if not controlling weight with the Court.   "A contemporaneous construction placed upon a particular provision of the organic law by the legislative department of the government, acquiesced in and acted upon without ever having been questioned   *   *   *   furnishes a very strong presumption that the intention is rightly interpreted."   *Catholic Cathedral* v. *Manning*, 72 Md. 130; *State* v. *Mahew*, 2 Gill, 487; *Worman* v. *Hagan*, 78 Md. 163; *Koehler* v. *Hill*, 60 Iowa, 557; *People* v. *Supervisors*, 100 Ill. 495, 504; *Sutherland, Stat. Construction*, secs. 307–311; *State* v. *U. S. Fidelity Co.*, 93 Md. 318.

Even this Legislature of 1904 in passing this bill intended to conform to the precedent, for the bill has a title, an enacting clause, and was intended to be submitted to the Governor and published in the printed volume of the laws of the State. These two Acts are chapters 96 and 97, and the published laws of the State skip from chapter 95 to 98.   There is a gap left where these other two enactments were intended to be placed.   See Acts of 1904, pp. 173–5.

It will not do to say that this construction amounts to nothing because no objection was ever made.   The drafting of a proposed amendment is a serious matter, and it cannot be supposed that the form which, as a matter of fact, was continuously adopted was not regarded as essential.   Legislative constructions do not, as a rule, grow out of contested points, for, if contested, the point would be decided by the judiciary. Such constructions are based upon unbroken, uninterrupted usage, and such we have in this case.   The presumptions, therefore, are all in our favor.

What is meant by "The General Assembly" in section 14 of the Constitution?

The appellee contends that "General Assembly" means only the two houses, the Senate and the House of Delegates. The appellant contends that it means "The General Assembly" in its organic capacity, of which the Governor is a part. A reference to the other parts of the Constitution in which the expression is used, shows its real meaning.

It is well settled that "the executive is by the Constitution a component part of the law-making power. In approving a law, he is not supposed to act in the capacity of the executive magistrate of the State, whose duty it is to see that the laws are properly executed; that is a part of the legislative branch of the government. This power is a unit though distributed, and the parts can only act in unison." *Fowler* v. *Peirce,* 2 Cal. 172; *Cooley, Const. Limitations,* sec. 153.

Let us apply the construction *in pari materia.* The point to be decided is—what is meant by *"The General Assembly"* in Art. 14? In this same article the same expression is used. It is provided in Art. 14 that the proposed amendment "shall be submitted in a form to be prescribed by the *General Assembly.*" The expression there manifestly means the General Assembly in connection with the Governor, that is, the General Assembly in its organic character as a Legislature. For it will be conceded that any Act passed by the General Assembly prescribing the form of submission of the proposed amendment must be signed by the Governor, though his name is not mentioned. He is necessarily included in the expression "General Assembly," and is a component part thereof. As stated by Cooley: "The power of the Governor as a branch of the legislative department is almost exclusively confined to the approval of bills." *Cooley, Const. Lim.,* sec. 155.

In sec. 2 of Art. 14 of the Constitution the same expression is used :

"Sec. 2. It shall be the duty of the *General Assembly* to provide by law for taking * * * the sense of the people in regard to calling a convention, etc." It cannot be denied that in this section the expression *"General Assembly"* includes the Governor, for no law to take the sense of the people

would be valid without his signature. In accordance with this, the Act of 1886, ch. 112, was passed.

So in Art. 11 of the Constitution, entitled "City of Baltimore," sec. 9 provides: "Sec. 9. The *General Assembly* may make such changes in this Article  *  *  *  as it may deem best." Here, too, "*General Assembly*" includes the Governor, and in accordance therewith the following Acts of Assembly were passed: 1870, ch. 116; 1888, ch. 397.

In each of the following sections of the Constitution the expression "*General Assembly*" includes the Governor, for without his concurrence its action would be invalid: Art. 1, secs. 4, 5; Art. 3, secs. 4, 29, 31, 32, 33, 34, 35, 36, 37, 39, 40, 42, 44, 45, 46, 47, 48, 49, 50, 52, 53, 55; Art. 4, sec. 39; Art. 11, sec. 9; Art. 12, secs. 1, 3; Art. 13, secs. 1, 5, 6; Art. 15, sec. 1.

We see, therefore, by an examination of other parts of the Constitution, that the words "*General Assembly,*" as a rule, mean the General Assembly in its organic legislative capacity, including the Governor, and not simply the two houses.

As a rule, in the various States where amendments are to be proposed by the members of the two houses acting as a sort of convention, it is so expressly provided.

*Jamison on Constitutional Conventions*, sec. 541, gives the provision contained in the constitutions of most of the States. The language generally used is—"Any amendment or amendments to this Constitution may be proposed in the Senate or House of Representatives; and if the same shall be *agreed to* by  *  *  *  of the members elected to each of the two Houses, etc. In those States, the amendment is not to be proposed by the Legislature, but by certain members in each house. Their concurrence is not expressed by an enactment, or any other legislative form, but by a mere agreement.

*It is to be noted that the cases cited by the appellee,* were constructions of Constitutions, which gave the power of proposing amendments not to the Legislature, or the General Assembly, but to a certain number of the members in each house, agreeing together. *Comm.* v. *Griest,* 50 L. R. A. 568;

*In re Senate File 31.*, 25 Neb. 864; *Green* v. *Weller*, 32 Miss. 650; *Nesbit* v. *People*, 19 Col. 441; *Koehler* v. *Hill*, 60 Ia. 546.

It was largely because the amendments to the Constitution were to be proposed in these States by a certain number of members in one house, agreed to by a certain number in the other, and not by the Legislature, that the authorities cited hold that the Governor has nothing to do with the question of proposing amendments.

The argument we have made above is not conclusive. The expression "General Assembly" may possibly mean the two Houses to the exclusion of the Governor, and is undoubtedly used in the Constitution of Maryland in this sense in a few instances. But in the great majority of instances, in fact, in nearly all the instances, it is used in the sense for which we have been contending.

But the argument is made conclusive when we see that an amendment is not only to be proposed by the "General Assembly," but by bill. In passing a bill, the Legislature always acts in its organic capacity as a legislative body. Not that the bill becomes a law in this case. It becomes a proposed amendment. But being required to be passed by *bill*, it necessarily goes through all the processes fixed by the Constitution for the enactment of a law.

The form of proviso that the amendment shall be by bill, is even more clearly seen in the original report of the Committee to the convention of 1867 before it was revised as to its style. The report read: "Any specific amendment or amendments to the Constitution may be proposed by the General Assembly, *provided the same be by bill*, proposing a separate amendment, which shall embody the entire article or section as the same will stand when amended." *Proceedings of Convention*, p. 349.

Why did the Constitution insist that all proposed amendments must be by bill? If the mere concurrence of a number of the members of each House were all that were necessary, why should not a separate resolution in each House, or a resolution in one House concurred in by the other, or a

joint resolution passed by the requisite number in each house, be sufficient? If the proposition of the appellee be correct, all that is necessary in proposing an amendment would be to introduce it into one house, pass it by a three-fifths vote, and have it concurred in by three-fifths of the other house. The concurrence of three-fifths in each house is the essential thing according to the appellee. No checks or safeguards against improvident or hasty proposition of amendments, he argues, were within the contemplation of the Constitution.

But it is well settled that the provisions of the Constitution as to the mode of proposing amendments must be strictly followed in order to make the submission valid. *Koehler* v. *Hill*, 60 Iowa, 546. It is also well settled that whenever the Constitution requires a *bill*, a *joint resolution* is void. *Henderson* v. *Collier*, 2 Col. App. 251; *May* v. *Rice*, 91 Ind. 546; *Boyns* v. *Crane*, 1 W. Va. 176.

So that the proposed amendments in this case could not be validly submitted by a resolution. They must be submitted by *bill*. But why? A resolution would evidence the concurrence of the requisite three-fifths of the members elected to each house, as well as a *bill*. There must be something in the method of passing and preserving a bill, as distinguished from a resolution which caused the convention to *insist* that an amendment should be proposed in this way and in no other. And this is just our contention. A bill in passing into the form of a law is surrounded by well-known checks and safeguards. It is authenticated in a definite way, and preserved in a certain way. In the passing of a bill there are three things to be considered. (*a*) The checks and safeguards in passing it. (*b*) The authentication. (*c*) Its preservation.

When the Constitution provided that amendments should be proposed by the *General Assembly* by *bill*, it meant that these amendments should be passed, authenticated and preserved as bills are for the plainest reasons of public policy.

Article 14 of the Constitution does not stand by itself, as do corresponding articles in other Constitutions, but uses the expression "in a separate bill," which requires of necessity a

reference to Art. 3 of the Constitution to see what a bill is and how it is passed. Art. 3, sec. 29, of the Constitution provides that "all laws shall be passed by original bill," just as Art. 14 provides that all proposed amendments shall be by separate bill.

Of the provisions relating to bills, we note the following:

1. Shall have a title.    Art. 3, sec. 29.

2. Shall begin.    "Be it enacted."

3. May originate in either house and be altered, amended or rejected by the other.    Art. 3, sec. 27.

4. Shall not originate in last ten days of session, except on two-thirds vote.    Art. 3, sec. 27.

5. Shall be read on three separate days in each house.    Art. 3, sec. 27.

The purpose of these clauses is to prevent hasty and improvident legislation and to compel the careful examination of proposed laws.    *Cooley, Con. Limitations*, p. 199.

Is it less important that proposed amendments to the Constitution should be carefully and critically examined before they issue from the Legislature?    The people are called to pass upon them, it is true, but the people cannot in any way change the form in which they are submitted.    They can only vote yea or nay.    Again, by our Constitution, the General Assembly is obliged to submit the amendment in the precise form it will have when amended (a power the Legislature would not have unless expressly given.    *Gabbert* v. *C. R. T. & P. Co.*, 171 Mo. 95.)    This is the usual legislative work. The amendment is put into form just as a law is, and requires, if anything, more care in its preparation than a law.    *Jamison, Const. Conventions*, sec. 538.

We, therefore, pointedly ask these questions: Would the proposed amendment have been valid if it had been passed

1. Without a title.    2. Without the enacting clause.    3. If introduced within the last ten days of the session without a two-thirds vote.    4. Without three separate readings in each house?

. As a matter of fact, it was passed with all these prescribed

forms.   But why?   Was it not because passing by bill means
and requires all the things necessary to transform a bill into
a law?

The Constitution provides for the authentication of a bill,
so that the measure actually passed by the Legislature should
be correctly applied, and not a false or fictitious or altered or
changed measure,   And therefore we have the following pro-
visions:

1. Every bill shall be engrossed before its third reading.
Art. 3, sec. 27.   Engrossment is an essential part of legisla-
tion.   *Dowling* v. *Smith*, 9 Md. 279.

2. Every bill shall be sealed with the great seal.   Art. 3,
sec. 30.

3. Shall be signed by the Governor in the presence of the
presiding officers and Chief Clerk of the Senate and House of
Delegates.   Art. 3, sec. 30.

This is the only method prescribed for authenticating a bill,
for securing its integrity.   It is a very effective method and
was obviously within the meaning of the Constitution when it
prescribed that amendments shall be proposed by bill.

Article 14 of the Constitution does provide that the yeas and
nays shall be "entered on the journals with the proposed
amendments."   Now if the proposed amendments were re-
quired to be entered on the journals by being entered in full,
*e. g.*, spread out on the journals, there might be at least some
method of compulsory authentication, though far inferior to
the method prescribed in case of a bill.   But it has been flatly
decided in Maryland that entry in the journals does not mean
entry in full, and that an entry by titling is sufficient.   *Wor-
man* v. *Hagan*, 78 Md. 163.

So that by the contention of the appellee there is no method
of authenticating a proposed amendment.   Surely this cannot
be the intent of the framers of the Constitution.

It was just this difference between a resolution and a bill
that led the Supreme Court of Iowa, in *Koehler* v. *Hill*, 60
Iowa, 549, to decide, contrary to the Maryland decision, that
entry in the journal meant entry in full.   The Court in that

case, pp. 554–59, fully reasons out the distinction between a *bill* and a resolution proposing an amendment to the Constitution, and shows that a bill must be enrolled, signed by the President of both Houses, signed by the Governor, and its custody provided for, and therefore is fully authenticated; but a resolution proposing an amendment to the Constitution requires none of these things, and that, therefore, the journals would be the only official authoritative evidence of the amendment.

To the same effect is the case of *Oakland* v. *Hilton*, 69 Cal. 490, where the great purpose of entry on the journal was declared to be "to preserve in permanent and enduring form authentic and recorded evidence of the contents of the amendment proposed, that is, in the form in which it appears on such record it may be submitted to the electors for ratification."

The Court then distinguishes the case of a *bill* and shows the necessity for entry in the journal as follows: "Here the point arises as to a proposed amendment to the Constitution, *and the law as to enrollment, authentication and deposit with the Secretary of State does not embrace* it."

In Maryland, the framers of the Constitution of course saw the necessisy of authorizing a proposed amendment to the Constitution and fully provided for it in requiring the amendment to be proposed by bill. This, of itself, carried with it all the provisions of the Constitution we have just cited as to the method of authenticating bills.

In this case the Legislature of 1904 felt the force of this argument. They did engross the bill, and did have it signed by the president of each house. But they did not have the great seal of the State affixed, nor secure the signature of the Governor. Why? Why did they follow some of the authenticating provisions and neglect others? They are all equally prescribed and most of them in the same section of the Constitution. No rational answer can be given to this question.

Article 3, sec. 34 of the Constitution provides that "every

law shall be recorded in the office of the Court of Appeals and in due time be printed, published and certified under the great seal, to the several Courts, in the same manner as has been heretofore usual in this State." It is true that the Constitution says "every law," but a law is nothing but a bill which has been passed. The document recorded is really the enrolled bill. In its effects it is a law, but the document still remains a bill, though one which has been passed and enrolled. "When a bill is duly passed by a legislative body, it becomes an act of that body, that is, a thing done." 1 *Am. & Eng. Ency. of Law*, 2 ed. 575.

In Constitutions, the word "bill" is often used as synonymous with the word "law" or "Act." Thus where a Constitution provided that no local or private bill should embrace more than one subject, it was held that the word bill was used in the sense of law or Act, an Act being merely a perfected bill. *Durkee* v. *Janesville*, 26 Wis. 703; *Sedegewick County* v. *Bailey*, 13 Kan. 608; *Com.* v. *Greist*, 50 L. R. A. 572.

Again it is stated in 26 *Am. & Eng. Ency.*, 2 ed., p. 555: "The enrolled bill is the original Act. It is to be looked to when the Act, as printed in the statute book, is attacked, and if the two differ, the bill as enrolled holds." This Court has very clearly shown that a bill which has passed and become a law is still a bill; that is to say, that the engrossed document which has received the signature of the Governor and the presidents of the two houses, and which furnishes the evidence of the law, is still *a bill*. In *Berry* v. *Baltimore & Drum Point Ry. Co.*, 41 Md. 460, JUDGE ALVEY used this language: "It is contended by the appellant that the law must be taken to be as we find it evidenced by *a bill filed in the office of this Court* under the great seal and the signature of the Governor, while, on the other hand, it is insisted by the appellee that it is competent for this Court to examine the journals of the two houses of the General Assembly and the original engrossed bill with the endorsements thereon."

There are also cases of proposed amendments to Constitutions where the Act passed by the Legislature was distinctly

called a bill after its being filed in the appropriate office. For example, the case of *Green* v. *Weller*, 32 Miss. 650, the Court says: "The record of a public Act of the Legislature of this State is *the enrolled bill* clothed with the solemnities required by the Constitution, and filed in the office of the Secretary of State." And again, in the case of *Nesbitt* v. *People*, 19 Col. 441, the Court, speaking of a proposed amendment, and passed in the form of an Act, said, "The amendments were preserved by the enrolled bill."

When the Constitution provided that amendments should be proposed by the General Assembly by bill, they, therefore, meant in addition to the safeguards used in passing a bill and in authenticating it, precisely the same provisions for preservation of a bill should also be applied to amendments. Otherwise, there would be no place of custody for the document, no safeguards thrown around its integrity, no method of securing a precise copy for publication by the Governor. Just as a bill which eventuates in a law is recorded in the office of the Clerk of the Court of Appeals, and when so recorded is still an enrolled bill, so a bill which eventuates in a proposed amendment, and for the same reasons, is recorded in the Clerk's office of the Court of Appeals.

The Senate of 1904 seem to have realized at least this much, for by their resolution they directed this document to be recorded in the Clerk's office of the Court of Appeals. Manifestly, there was no authority for this of any kind, unless derived from sec. 30 of Art. 3 of the Constitution.

It is objected that amendments to the Constitution are not law-making but constitution-making; that, therefore, the only parties interested are the two houses of the Legislature and the people, and this seems to be the main argument in the case of *Commonwealth* v. *Greist*, 50 L. R. A. 568. We have already partially answered this objection. We conceded that the proposal of amendments to the Constitution is not law-making in the ordinary sense, but evidently there can be no constitutional objection to having the Governor join in a proposal for amendment with the houses of the General Assem-

bly.  It all depends upon the intention of the Constitutional convention in passing Art. 14.  If they had said in express terms, that every proposed amendment shall be passed by three-fifths of each house of the Legislature, with the approval of the Governor, there, of course, would be no question.  The only point in issue is as to how the proposed amendment shall issue from the Legislature, whether with or without the approval or interference of the Governor.  The argument thus far made in this brief shows that in Maryland it was intended that the Governor's signature should be on the proposed amendment in order to validly submit it to the people, because of the special terms of Art. 14, to wit., that the amendment should be proposed by the General Assembly and by bill.

It is objected that it would be irrational to submit a proposed amendment to the Governor for his approval, because it must be passed by three-fifths of the members elected to each house, and three-fifths of the members of each house is the precise number authorized to repass a bill over the Governor's veto.  This argument is more plausible than sound. If it were sound, it would be unnecessary to present any bill to the Governor for his approval which had passed each house by the vote of three-fifths, or more, and yet, it is well known that every ordinary bill, even though passed unanimously by both houses, must of necessity, be presented to the Governor for his approval, and it has happened in the history of Maryland legislation that bills which have been unanimously passed by both houses of the Legislature, when submitted to the Governor were vetoed by him, he giving his reasons therefor, and upon reconsideration the veto was unanimously sustained.

An illustration of this principle is found in *State* v. *Crouse*, 20 L. R. A. 265, wherein it was decided that a bill required the approval of the Governor even though it was of a character which required a two-thirds vote to pass it, and even though under the Constitution a veto could be overridden by a three-fifths vote.

It is argued that the Governor has no right to get between

the two houses and the people. This, however, is merely begging the question. The Governor has nothing to do with the ratification of the amendment or its adoption. His duty is simply in reference to its proposal to the people, whether it shall be proposed, and the form in which it shall be proposed. It is not *rational*, therefore, to speak of the Governor usurping the power of the people to ratify a proposed amendment. In addition to this, it is conceded that when the sense of the people is to be taken in regard to calling a convention for altering the Constitution, the matter cannot be proposed to them without the approval of the Governor or overriding his veto, because sec. 2 of Art. 14 provides "it shall be the duty of the General Assembly to provide *by law* for taking at the general election to be held in the year 1887, and every twenty years thereafter, the sense of the people in regard to calling a convention for altering the Constitution, and assuredly, the question of taking the sense of the people to revise the whole Constitution is a very much more important matter than submitting a single change to the people. The history, therefore, of constitutional amendments in the State of Maryland, shows that the Governor was intended to be a party to the proposition. This, as we have already seen, has been reinforced by a continuous, uninterrupted usage.

It is objected that Article 14 of the Constitution provides that "The bill or bills proposing amendment or amendments shall be published by order of the Governor," and that this means a bill as distinguished from an Act. The unreasonableness of any such distinction between *bill* and *act* has already been fully discussed.

We maintain that the authorities cited by the appellee are not applicable because they construe Constitutions that are essentially different from the Constitution of Maryland.

In *Hollingsworth* v. *Virginia*, 3 Dallas Reports, 378, it was held that a joint resolution of Congress, proposing an amendment, did not require the signature of the President. An examination of Article 5 of the Constitution of the United States, however, shows that the intention of that Constitution

was to require nothing more than an expression of opinion that amendments were necessary. Article 5 of the Constitution provides: "That Congress, whenever two-thirds of both houses shall deem it necessary, shall propose amendments to this Constitution, which shall be valid to all intents and purposes as part of this Constitution when ratified by the Legislature of three-fourths of the several States, or by conventions in three-fourths thereof, as the one or other mode of ratification may be proposed by Congress."

Article 5 did not provide how the amendment should be proposed, whether by bill or by resolution, or how. *Jamison on Constitutional Conventions*, in sec. 557, explains this case, and shows precisely why it was that the decision was reached. He says in section 557, after speaking of the question of submitting a joint resolution to the Executive: "On the other hand, a close examination of Article 5 shows that it contemplates nothing but a mere expression of opinion that amendments to the Constitution are necessary. That body being a numerous one, and representing the people, it is deemed probable that, whenever two-thirds of both its branches pronounce particular organic changes to be expedient, such is the sense of the people at large. There is to be no submitting of propositions to a vote of the people, consequently no directions for conducting an election, or making returns of votes— in short, no prescribing of a rule of action to officers or citizens, for the reason that all action upon the subject is to be taken by separate agencies fully organized under State laws. In this view of the Constitution, then, the necessity of executive approval seems to be very doubtful; and of this opinion are the authorities generally."

The argument already made is much strengthened by another provision of Article 14 of the Constitution. After providing for the publication of the bill proposing the amendment to be voted for at the next ensuing general election, the Article proceeds: "*At which the said proposed amendment or amendments shall be submitted, in a form to be prescribed by the General Assembly, to the qualified voters of the State for adoption or rejection.*"

This Article 14 provides, therefore, not only for passing the proposed amendment and publishing it, but also provides that the General Assembly shall prescribe the *form of submission.*" This, of course, must be by a law which must be presented to the *Governor for his signature.*

(*a*) The question now arises—was it not the intent of the Constitution that the proposed amendment and the form of submission should be contained in the same bill? If so it would seem conclusive of the question at bar, for in that event the entire bill, section 1, containing the proposed amendment and section 2, prescribing the form of submission, *e. g.*, how the ballots were to be prepared and marked, should be presented to the Governor for his signature. The modal regulations contained in section 2 is clearly a law, for its provisions govern the voters and all the officers of election. Section 2 requires no ratification by the people. On the contrary, it is to be effective as a law governing the voters and officers of election in the very election at which the proposed amendment is submitted to the people. This construction has behind it and in its favor the uninterrupted usage of the Legislature, since 1867. In every case of a proposed amendment, since 1867, the bill proposing the amendment had two sections—section 1 containing a proposed amendment, and section 2 containing the method of balloting as prescribed by the General Assembly. This construction also has in its favor the high authority of *Jamison on Constitutional Conventions,* secs. 547, 548, 556.

In New York the proposal, if in the form of a resolution, is not submitted to the Governor, *but if in the form of a bill, it is submitted to the Governor.*

In Michigan and Minnesota the proposed amendments are accompanied by clauses submitting them to the people in a single Act. It is the practice to present to the Governor for his approval. See sec. 561.

But suppose it was not intended by the Constitution that the Legislature should necessarily present a proposed amendment and the method of submission in a single Act. Suppose the

Legislature could, if it saw fit, propose an amendment in one
*bill* and prescribe the form of submission in another bill or
provide for it in the general election law, how would the case
be affected under that construction ?

We must observe that in the concrete case at bar we are dis-
cussing, the Legislature *did, as a matter of fact, combine the*
*proposed amendment with the method of submission,* and it is the
validity of this single Act which we are discussing.    If the
Legislature had proposed the amendment in one bill alone
and provided for the method of submission in another, or left
the method of submission to the provision of the general elec-
tion law, then another question would have arisen.    But it did
not do this.

Now when a proposal for an amendment is contained in
sec. 1, and a method of submission in sec. 2, does this not, of
necessity, require that the entire Act should be presented to
the Governor ?    The Act was intended by the Legislature to
be an entirety.    It was not intended by it to be broken up piece-
meal.

This matter has been precisely decided in California.    It is
not necessary under its Constitution that the proposed amend-
ment and the method of submission shall be embraced in the
same Act of the Legislature.    *Martin* v. *Commissioners,* 126
Cal. 419.    But when in that State these two things, as a mat-
ter of fact, were embraced in a single Act, the Court held the
signature of the Governor to be necessary.    *Hatch* v. *Stone-*
*man,* 66 Cal. 632.    The Court say, "It will be remarked that
the power to propose an amendment to the Constitution is
vested in the two houses—Senate and Assembly—and if two-
thirds of all the members elected to each of the two houses
vote in favor thereof, it shall be the duty of the Legislature to
submit such proposed amendment or amendments to the peo-
ple to be voted on.    The proposal of the amendment or
amendments is not by the Legislature as such in the ordinary
enactment of a law, and with the proposal the Governor has
nothing to do.    The Act is that of two-thirds of each branch
of the Legislature.    *But the matter of submitting the proposed*

*amendment or amendments to the vote of the people is quite different.* That it is to be done by the Legislature, by a law to that effect, and in the enactment of a law the Governor is part of the law-making power."

This ought to be conclusive of the question at bar.

(*c*) But it is argued by the appellee, and this is his main contention on this branch of the case—that sec. 1 is good without signature of the Governor, as it is only a proposed amendment; sec. 2 may be invalid, as it is essentially a law and requires the Governor's signature; but the invalid section may be disregarded and sec. 1 may be allowed to stand by itself.

This argument is fallacious. 1. It was never intended by the Legislature that sec. 1 should stand alone. It was connected with sec. 2 in one Act, and the Legislature intended them to be connected as one integral whole. More than this, it is evident, when the Act passed each house, it was intended that the whole should be submitted to the Governor for his approval. This is conceded by the appellee. In the presence of these facts there is no room for the principle that part of the law should be allowed to stand and other part be declared void.

2. The principle of declaring one section valid and another void applies only when the sections are severable, and when it can be seen that in the intention of the Legislature it would make no difference whether they were separated or not. But when the intent of the Legislature is clear that they were intended as inseparable parts of the same thing, mutually dependent on each other, then if one section is void the whole is void. *State* v. *Benzinger*, 83 Md. 488.

The appellee argues it makes no difference in the intention of the Legislauture whether sec. 12 stands or not. That it can be declared void and the proposed amendment may be submitted to the people under the terms of the general election law. There might be some force in his argument (though we do not think even then it would be entitled to much weight), if the method of submission provided for in sec. 2 of

the Act and the method provided for under the general election law were the same.

By the general election law it is provided:

51. If at any election there be a constitutional question or any other question to be submitted to the popular vote, the said question shall be placed upon said ballot in the following form: "For Constitutional Amendment," "Against Constitutional Amendment," "For Proposition," "Against Proposition," and said respective questions shall be placed in a column, as hereinbefore mentioned, so that the same shall form a parallelogram or space where the voter may clearly indicate, in the way hereinafter pointed out, whether he shall wish to cast his ballot for or against the Constitutional Amendment, or proposition or propositions submitted. Acts 1901, ch. 2, sec. 51.

By this section it is clear that in voting for Constitutional Amendments: (1) The ballot should have "For the Constitutional Amendment" and "Against the Constitutional Amendment." (2) These two expressions were to be on the same ballot. (3) A space is provided in which the voter is to make his mark.

Now, if anything is clear in this case it is that the Legislature of 1904, by the Act of 1904, chap. 96, sec. 2, intend to repeal the general election law, so far as the submission of this proposed amendment is concerned. By section 2, the vote "shall be by ballot, and upon each ballot there shall be *written* or printed the words 'For the Constitutional Amendment,' or 'Against Constitutional Amendment,' as the voters shall elect."

This is a return to the old system of voting and is copied *verbatim* from Article 15 of Constitution of Maryland, subtitle "Vote on the Constitution," prescribing how the Constitution of 1867 was to be voted for.

The method differs from the method prescribed in the general election law as follows: 1. Voter may furnish the ballot himself. 2. On the ballot he may write or have printed "For the Constitutional Amendment" or "Against the Constitutional

Amendment." 3. Both these expressions cannot be on the same ballot. 4. No space or square provided for mark. 5. Ballot not official.

Now, when the Legislature proposes an amendment to section 1, and in section 2 of the same Act provides a special method of submission, entirely different from that contained in the general law, it cannot be successfully argued that the Legislature did not intend the two sections to stand together. It cannot be maintained that in the intention of the Legislature one section might stand and the other fall.

*Bernard Carter* and *John Prentiss Poe* (with whom was *Alonzo L. Miles* on the brief), for the appellee.

Our contention is that Article 14 is a plain, clear and um-ambiguous provision for the whole subject of amendments to the Constitution, dealing distinctly, separately and specially with that single subject—that by its plain words and manifest intent it provides that amendments may be proposed by the *General Assembly*—meaning thereby the Senate and House of Delegates, each house acting by a vote of three-fifths of all the members elected to it—that each amendment shall be in a "separate bill"—that "bills" proposing amendments are wholly distinct in their very nature from ordinary measures of legislation, and that, accordingly, they are not required to be submitted to the Governor for his executive consideration as in the case of ordinary legislation, but that when duly passed in the shape of *"bills"* by the prescribed vote in each house, they *"shall be published by order of the Governor"* in the mode and for the period prescribed, *and that in relation to bills proposing amendments to the Constitution, the only function to be exercised by the Governor is to order them to be published as prescribed, for adoption or rejection by the people.*

We find support for our contention in all the adjudicated cases, *without one single exception*, where the question has been raised. Some of these cases are *Hollingsworth* v. *Virginia*, 3 Dallas (U. S.) 381; *In re Senate File 31*, 25 Neb. 864; *Green* v. *Weller*, 32 Miss. 650; *Hatch* v. *Stoneman*, 66 Cal. 632;

*Koehler* v. *Hill*, 60 Ia. 543; *Commonwealth* v. *Griest*, 196 Pa. St. 396; *State* v. *Mason*, 43 La. Ann. 590, 649; see also *Debates, Mass. Convention, 1820*, p. 407; *Debates, Va. Convention, 1829*, p. 887.

The whole subject is quite fully considered in *Jamison's Constitutional Conventions*, secs. 556–565, and the view contended for by us declared to be correct, and sustained by all the authorities.

In *Commonwealth* v. *Griest*, 196 Pa. St. Rep. 396, the bill in accordance with the uniform practice in Pennsylvania was presented to the Governor and he vetoed it by a pocket veto.

And in *State* v. *Mason*, 43 La. Ann. 590, the bill was in like manner presented to the Governor and he vetoed it, sending his veto message to the house in which the bill originated. In that house it was passed over his veto, but in the Senate his veto was not overcome by the required vote.

In each of these two cases, however, the Supreme Court of the State held that bills proposing amendments to the Constitution are not required to be sent to the Governor like ordinary measures of legislation, and that consequently the executive veto was ineffectual.

We freely concede that the question is one depending for its solution upon the true meaning of our own Constitution, but we insist that the provisions of our Constitution are so similar in terms and so identical in meaning with the provisions of the Constitution of the United States and of the several States considered and passed upon in the adjudications cited and relied on by us, that these adjudications cannot fail to be followed by this Court as conclusive of the questions in controversy here.

The whole argument of the learned counsel for the appellant is built upon the word "bill" in Article 14. They claim that by the use of this word the framers of the Constitution and the people who adopted it meant an ordinary legislative bill, which, before it could be finally operative, must go through all the formalities requisite to the complete development of a "bill" into a "law," or an "Act" including execu-

tive approval or due passage by each of the two houses over executive veto.

Now we might very well insist that a question of this character cannot properly be settled upon what may fairly be treated as a mere verbal criticism, but that it must be determined upon a broad view of the object and effect of a *proposal to the people* by their representatives in the Legislature to amend the Constitution—upon a consideration of the intrinsic nature of such a proceeding by the two houses of the General Assembly and upon the effect of the approval or disapproval of the Governor of what after all is obviously and necessarily a mere tentative proposal to the people without any operative force whatever unless ratified by them.

Looking at the question in this light, an argument founded almost exclusively on the effect of one single word might not unreasonably be claimed to rest upon too slender a foundation to be accepted as sound.    And we accordingly insist that it cannot be treated seriously.

Under Constitution, Art. 2, sec. 17, and Art. 3, sec. 30, the obvious and indeed the only purpose was to make the Governor an integral and essential part of the *law making* power of the State, precisely as the President of the United States is of the law making power of Congress.    Indeed, with the exception of four preliminary lines in sec. 17 of Art. 11 (which lines serve to make more plain that its purpose was to limit executive consideration to bills, which when approved by him or passed over his veto, should become laws.), this section is taken bodily from sec. 7 of Art. 1 of the Constitution of the United States.

There is no suggestion in Art. 14 of the necessity of executive approval before the General Assembly can even be permitted to propose to the people a change in our organic law.

There is, on the contrary, a special requirement (found in no other Art. of the Constitution), that the vote necessary to such *proposal* is a three-fifths vote.    If the design had been to give to the Governor the power to thwart the will of the General Assembly and to disable them, without his consent, from

even proposing to the people an Amendment to the Constitution, is it not manifest that the provision in relation to Amendments would not have been thus made special and peculiar as to the vote necessary to propose them, but would have been left to be controlled by the regulations governing ordinary legislation? Why require a three-fifths vote in each house in the first instance if the Governor's approval was intended to be necessary, or if this same three-fifths vote in each house was required to overcome his veto? Why require a three-fifths vote *twice ?*

Again, inasmuch as a three-fifths vote of each of the houses, which constitutes together the General Assembly, is required for the passage of a measure proposing a Constitutional Amendment, and as such measures as are contemplated to be presented to the Governor for his approval before they become laws by sec. 16 of Art. 2, and sec. 30 of Art. 3 only require, for passage over his veto, a vote of three-fifths of the members elected to each of the houses, what reason could there be, in the minds of the framers of the Constitution, for subjecting a proposed Constitutional Amendment to the process of being sent to the Governor for his approval (independently of all other consideration applicable to the subject), when the same vote is required to secure, in the first instance, the consent of the two houses of the General Assembly to a proposed amendment to be submitted to the people, as would be required to overcome a veto by the Governor of the action of the two houses of the General Assembly?

We must insist that the subject is wholly covered by Art. 14 as it stands, and that when the Article declares that the "bill or bills" shall be published, its framers and the people who adopted it meant precisely what these words in their plain, natural and ordinary sense mean.

It does not say the "law or laws proposing amendment or amendments," or the "Act or Acts proposing amendment or amendments," shall be published by the Governor, but the "bill or bills proposing amendments."

The framers of the Constitution and the people who adopted

it knew the distinction and difference between a "bill" and a "law" or "Act." They knew perfectly well that a proposed measure of legislation is ordinarily, as well as technical, called a "bill," until by executive approval it has ripened into a "law" or an "Act." When approved by the Governor or passed over his veto it ceases to be a "bill." It is no longer called a "bill," but has developed into a "law" and is usually called "An Act." Indeed, the word "a bill," which precede every proposed piece of legislation are omitted when it has passed through all the steps necessary to make it a law, and it is then styled "An Act." Hence, when we find Art. 14 directing the Governor to publish "the *bill* or *bills* proposing amendments," we see clearly that it meant proposals passed by the General Assembly by the specially designated vote in each house, not treated as legislation necessary to be submitted to the Governor in order "to guard against hasty and partial *legislation*," but as proposals submitted *to the people* by their representatives in the Senate and House of Delegates, and as to which the Governor has no function whatever to perform except to publish them. He is the chosen ministerial officer to order them to be published for the information of the people, but inasmuch as they do not constitute *legislation*, which his approval would make operative, so they do not and cannot constitute *legislation* which his veto may obstruct or defeat.

Upon the face of Art. 14, it is, therefore, apparent that the claim made that the Governor's concurrence in proposals from the General Assembly to amend the Constitution passed by each house by the specially exacted vote of three-fifths of their elected members, respectively, is necessary, cannot be sustained by any proper interpretation of that Article.

In the Court below the suggestion was made that the two bills now under consideration, in addition to setting out the proposed Amendments in the form prescribed by the General Assembly, contained a section directing that they should be submitted to the people, and that this provision made them something more than mere bills outside of executive power,

and brought them within the area of legislation subject to revision by the Governor.

No stress was apparently put upon this suggestion; but as it may be again presented here it may be proper to notice the point. It will be found, we submit, that there is no such additional matter of legislation in the bills.

But if there were, its introduction could not invalidate the complete and perfect proposed amendments properly formulated by the General Assembly in each separate bill.

The well-established maxim of *utile per inutile non vitiatur* would in such view be distinctly applicable and controlling. But sec. 2 is only a repetition of a requirement of Art. 14, and, moreover, as the learned Judges of the Court below in their opinion well say, the mode of submitting proposed constitutional amendments to the people is already abundantly provided for in our general election law (Code, Art. 33), and hence a total failure to make any provision for submission to a vote of the people on the bills would not at all affect their validity.

The counsel for the appellant point to the fact that since the adoption of our present Constitution there have been proposed about eighteen amendments to the Constitution, and that in every one of these cases the "bills" were submitted to the Governor and made "*Acts*" by his approval, and they rely on this practice as a strong argument in support of their contention. Such was the fact in Pennsylvania and Louisiana; but a mere practice or even a legislative interpretatien of the Constitution was held in the two cases of *Commonwealth* v. *Greist*, 196 Pa. St. 396, *supra*, and *State* v. *Mason*, 43 La. Ann. 649, *supra*; not to be sufficient ground to control the judgment of the Court. And so, here, silent acquiescence in a plainly erroneous construction of the Constitution cannot lead this Court to perpetuate an error on a question never heretofore raised.

In the details regulating the mode of proposing and adopting amendments there is some variety; but so far as the origination of them and the absolute and *exclusive* power of the

two branches of the Legislature over them are concerned there is a striking and impressive uniformity, to which we find now but one exception.

Thus in Delaware: The General Assembly, whenever two-thirds of each house shall deem it necessary, *with the approbation of the Governor*, may propose.

And in Louisiana (under the Constitution of 1845), the approval of the Governor to all proposals of the amendment by the "General Assembly" was required; but in the successive Constitutions of 1852, 1864 and 1868, this provision was omitted, and it is omitted also in the Constitution of 1875; and the language now is that "the General Assembly may propose," etc.

The Constitution of Delaware and that of Louisiana of 1845 are the only cases in which the approval of the Governor has ever been required.

In every other instance there seems to have been a clear and unmistakable purpose to exclude the Governor from participation in proposals to amend the Constitution.

Missouri (1820—also 1875): "The General Assembly may at any time propose amendments " *Edwards* v. *Leuser*, 132 Miss. 433. Alabama: "The General Assembly, whenever two-thirds of each house, etc., may propose." Arkansas (1836): "The General Assembly, etc., may propose." (1868): "Either branch of the General Assembly may propose." Illinois (1818): "Whenever two-thirds of the General Assembly, etc." (1848 and 1870): "Whenever two-thirds of all the members elected to each branch of the General Assembly," etc., etc. Kansas (1885): "All propositions for amendments shall be made by the General Assembly." *Prohibitory Amendment Cases*, 24 Kan. 700. Rhode Island (1842): "The General Assembly may propose amendments." Texas (1845, 1866, 1868, 1876): "The Legislature, when two-thirds of each house shall deem it necessary, may propose." Nebraska: "Either branch of the Legislature may propose amendments." *In re Senate File 31*, 25 Neb. 864. Iowa: "Any amendment or amendments may be proposed in either house of the Gen-

eral Assembly." *Koehler* v. *Hill*, 60 Iowa, 543. Mississippi: "Whenever two-thirds of each branch of the Legislature shall deem any change, alteration or amendment necessary to this Constitution, such proposed change, etc." *Green* v. *Weller*, 32 Miss. 650. California (1849): "Any amendment may be proposed in the Senate or Assembly." (1862): "If at any time two-thirds of the Senate and Assembly, etc." *Hatch* v. *Stoneman*, 66 Cal. 532; *Oakland* v. *Paving Co.*, 69 Cal. 514. Colorado: "Any amendment may be proposed in either house of the General Assembly." *Nesbit* v. *People*, 19 Col. 441. Florida: "May be proposed in either house, etc." Georgia: "By bill read three times in each house on three several days." Indiana (1851): "May be proposed in either branch of the General Assembly." Michigan (1835, 1850): "May be proposed in the Senate or House of Represetatives." Minnesota (1857): "Whenever a majority of both houses of the Legislature, etc., they may propose such alterations and amendments which shall be published with the laws. *Julius* v. *Callahan*, 63 Minn. 154. Nevada (1864): "May be proposed in the Senate or Assembly." *State* v. *Davis*, 20 Nev. 220. New Jersey (1844): "May be proposed in the Senate or General Assembly." New York (1821 and 1846): Same substantially as New Jersey. North Carolina (1868): "By bill read three times in each house," etc. *State University* v. *McIver*, 72 N. Car. 76. Ohio (1851): "Either branch of the General Assembly may propose." Oregon (1857): "May be proposed in either branch of the General Assembly." Pennsylvania: Fully stated in *Commonwealth v. Griest*, 196 Penn. St. 396, *supra.* South Carolina (1790 and 1865): "No part of this Constitution shall be altered unless a bill to alter the same shall have been read three times in the House and three times in the Senate, etc." (1868): "May be proposed in the Senate or House of Representatives." Tennessee (1834–1870): "May be proposed in the Senate or House of Representatives." Virginia (1870): "May be proposed in Senate or House of Delegates and ratified by next General Assembly." West Virginia (1872): "May be proposed in other house and ratified,

etc."    Wisconsin: "May be proposed in either house and rat-
ified, etc."    Massachusetts (1780):  "Provision for taking the
sense of the people under a call to be made by the general
Court in 1795."  New Hampshire (1792): "Substantially as in
Massachusetts."   Kentucky (1850);  "When a majority in
each house shall concur in passing a *law* for the calling of a
convention, etc."

McSHERRY, C. J., delivered the opinion of the Court.

In March, 1904, the General Assembly of Maryland by a
three-fifths vote of all the members elected to each of the two
houses adopted two proposed amendments to the State Con-
stitution.    One was the proposition to amend sec. one of Art.
one relating to the elective franchise; and the other was a
proposition to amend section thirty-four of Article three, and
is known as the good roads amendment.    Neither of these
proposed amendments was submitted to the Governor for his
approval or disapproval, but both, duly certified by the pre-
siding officers of the two houses and by the Secretary of the
Senate and the Chief Clerk of the House of Delegates, were,
in obedience to a resolution passed by the Senate placed in the
custody of the Clerk of the Court of Appeals.    Thereafter the
Governor sent a message to the Senate in which, amongst
other things, his Excellency stated that he did not approve of
the elective franchise amendment, and that as it had not been
presented to him for his approval or disapproval, it could not
be lawfully submitted to the qualified voters of the State for
their adoption or rejection.    He expressed his willingness to
sign the good roads amendment.    It being made the duty of
the Governor under Art. 14 of the Constitution to order the
publication of the bill or bills proposing an amendment or
amendments, for at least three months preceding the next ensu-
ing general election at which any proposed amendment is to be
submitted to the qualified voters of the State for adoption or
rejection; the Hon. Murray Vandiver addressed to his Excel-
lency a letter on November the twenty-second, nineteen hun-
dred and four, asking him whether the opinion he entertained,

to the effect that a proposal to amend the Constitution could not be submitted to the people until it received his approval or until it had been adopted by the General Assembly over his veto, would lead him to refuse to cause the franchise and the good roads amendments to be published prior to the general election of nineteen hundred and five. In reply the Governor stated: "I will not cause to be published the proposed Constitutional amendments referred to * * because they have not been submitted to me for my approval as Governor and hence are not operative." On November the thirtieth Mr. Vandiver filed in the Circuit Court for Anne Arundel County a petition against the Governor and prayed therein that a writ of *mandamus* might be issued commanding him to publish the two proposed amendments in accordance with the requirements of Art. 14 of the Constitution. To this petition an answer was filed by the Governor. No issues are raised by the answer save the single one as to whether a proposition to amend the Constitution, though duly emanating from the General Assembly, must be approved by the Executive, or be passed over his veto, before being submitted to the vote of the people. The Circuit Court ordered the *mandamus* to issue and the respondent has appealed to this Court.

The primary and fundamental question is this: Does a proposal to amend the Constitution, after having been adopted by the General Assembly in accordance with the provisions of Art. 14, require the approval of the Executive, or must it be passed over his veto if he disapproves it, before the people are entitled to vote upon it? There is a second and subordinate inquiry which will be stated and discussed later on.

The case was argued with marked ability before the eight Judges of this Court and after mature deliberation we all agree that a proposition to amend the Constitution when formulated by the General Assembly in the manner prescribed by, and according to the requirements contained in Article 14, and when no measures which are distinctively and essentially legislative in their nature are appended to it, does *not* require the approval of the Governor before it can be voted on by the

people; and that the Governor has no authority whatever to veto it. The conclusion just stated is sustained by both reason and authority.

As much of the discussion will hinge on the language employed in Article 14, that article, in so far as it relates to the pending questions, will now be transcribed. "Section 1. The General Assembly may propose amendments to this Constitution; provided, that each amendment shall be embraced in a separate bill, embodying the article or section, as the same will stand when amended and passed by three-fifths of all the members elected to each of the two houses, by yeas and nays, to be entered on the journals with the proposed amendments. The bill or bills proposing amendment or amendments shall be published, by order of the Governor, in at least two newspapers in each county, where so many may be published and where not more than one may be published then in that newspaper, and in three newspapers published in the city of Baltimore, one of which shall be in the German language, once a week for at least three months preceding the next ensuing general election, at which the proposed amendment or amendments shall be submitted in a form to be prescribed by the General Assembly, to the qualified voters of the State for adoption or rejection." The remaining provisions of the section refer to the duties of the Governor with respect to proclaiming the results of an election after the votes cast for and against a proposed amendment have been returned to him.

Upon the part of the appellee it is contended that the term "General Assembly," as used in the above-cited section, means only the two houses of the Legislature—the Senate and the House of Delegates; whereas on behalf of the appellant it is insisted that the term signifies the General Assembly in its organic capacity, of which the Governor is a part. "The *General Assembly* may propose amendments to this Constitution." Unless the term "General Assembly" wherever used in the Constitution universally and invariably includes *proprio vigore*, the Executive, it cannot be affirmed that it, *of necessity and without more*, embraces him when employed

in Article 14. It must first be established that the term *never* excludes him before it can be predicated of it that it *always* includes him. Now, even a casual reading of the Constitution will show that something in addition to the words "General Assembly" is requisite to include under that term the Governor. In fact section one of Article three of the Constitution defines the term General Assembly. It reads thus: "The Legislature shall consist of two distinct branches—a Senate and a House of Delegates—*and shall be styled the General Assembly of Maryland."* This constitutional declaration as to what constituents or component factors make up the General Assembly explicitly excludes the Governor. But this is not all. Section fourteen of the same Article three provides that "The General Assembly shall meet on the first Wednesday of January, 1868, and on the same day in every second year thereafter and at no other time, unless convened by proclamation of the Governor." Section fifteen declares that "The General Assembly may continue its sessions so long," etc.; and section twenty-four provides that "The General Assembly shall create, at every session thereof, a joint standing committee of the Senate and House of Delegates, who shall have power to send for persons and examine them on oath, and call for public or official papers and records, etc." Section four of Article four declares that: "Any Judge shall be removed from office by the Governor   *   *   *   on the address of the General Assembly, etc." Here, then, are several instances, and there are quite a number of others that might be mentioned, in which the General Assembly is spoken of as wholly distinct from the Executive; and hence it demonstrably follows that the term "General Assembly" does not of itself or implicitly comprehend the Governor. In other words the General Assembly, composed of the Senate and House of Delegates, may exercise *some* powers without the concurrence or co-operation of the Governor; and, therefore, when it, the General Assembly, is authorized by the Constitution to perform a designated function there is involved no necessary inference that the Governor shall participate therein in order to give the Legislature's action potency.

If we go one step farther and examine the phraseology of Art. 14 in contrast with prior constitutions of this State, it will become apparent that the Governor has nothing to do with a proposed Constitutional Amendment except to order its publication for the period and in the manner designated in that article and to proclaim its adoption after it has been approved by the people.   Under the Constitution of 1776 the method of amending its provisions was by an Act of Assembly passed at one session and signed by the Governor, who then had no veto power and who was required to affix his signature to all enactments adopted by the Legislature; the publication of that Act before the next general election, but no vote upon it by the people, and its ratification by the succeeding General Assembly.   Amendments of the Constitution thus framed needed the signature, but not the approval, of the Executive, because it was made his imperative duty to sign *all* Acts of the Legislature.   To that extent, but with no discretion whatever, he participated in propounding and in adopting amendments of the organic law.   He had no power to withhold his signature from any proposed amendments.   By the Constitution of 1851, which was the second one adopted in Maryland, its provisions could only have been amended by a convention assembled for that purpose pursuant to Art. 11. The Governor was given no veto power.   The Constitution of 1864 contained two modes by which amendments could be made, both of which were contained in Art. 11.   By sec. 1 of that Art. it was declared that the "General Assembly may propose any amendment which shall be agreed to by three-fifths of all the members elected to both houses."   The section then required the proposed amendment to be published and subsequently to be voted on by the qualified electors at the next general election.   By the second section amendments were permitted to be made by a convention convened for that purpose but before any amendment so proposed could become effective it was necessary, under section three, that it should be adopted by a vote of the people.   Under the Constitution of 1864 the Governor had no veto power.   In not a

single instance had the Governor under the Constitutions of 1776, 1851 and 1864 any authority whatever to veto a proposal to amend the organic law; and it was not until the Constitution of 1867 went into effect that "to guard against hasty or partial *legislation*," not hasty or partial *amendments* to the Constitution, the Executive was clothed with a veto power.

Upon turning to and reading Art. 14 it must be conceded that its language is clear; explicit and unambiguous. It does not say that the General Assembly *and* the Governor, or the General Assembly *with the approval* of the Governor, but "The *General Assembly* may propose amendments to this Constitution, provided, that each amendment shall be embraced in a separate bill, etc." Such a proposal is not legislation. It is required to be passed by "three-fifths of all the members elected to each of the two houses," whilst a majority only is needed for the adoption of legislative measures; and even after receiving the prescribed number of votes in both houses it continues to be a *bill* and never becomes a *law*, though if adopted by the vote of the people it is thereafter incorporated in the Constitution. "The bill or bills proposing amendment or amendments shall be published by the order of the Governor, etc." The thing to be published is a *bill* proposing an amendment. Now, whatever legislation the Governor has a right to sign and does sign, ceases when signed by him, to be a *bill* and becomes a *law*. There are three ways in which a bill may become a law. First, by being signed by the Governor; secondly, by being passed over his veto; and thirdly, by his failure to return the bill within six days after receiving it, unless by adjournment the General Assembly prevents its return. To make this more clear it may not be amiss to quote sec. 17 of Art. two of the Constitution. It is in these words: "To guard against hasty and partial legislation and encroachments of the legislative department upon the co-ordinate executive and judicial departments, every bill which shall have passed the House of Delegates and the Senate shall, before it becomes a law be presented to the Governor of the State; if he approve he shall sign it, but if not he shall return it with his objections.

to the house in which it originated, which house·shall enter
the objections at large on its journal and proceed to recon-
sider the bill; :if, after such reconsideration, three-fifths of the
members elected to that house shall pass the bill, it shall be sent
with the objections to the other house by which it shall like-
wise be reconsidered, and if it pass by three-fifths of the mem-
bers elected to that house, it shall become a law * * * If any
bill shall not be returned by the Governor within six days
(Sundays excepted) after it shall have been presented to
him, the same shall be a law in like manner as if he signed
.it, unless the General· Assembly shall, by adjournment, pre-
vent its return, in which case it shall not be a law· * * *.''
The distinction between a *bill* and a *law* is carefully maintained·
throughout the aforegoing section; and the plain and clear
provisions of the section make it morally certain that it has
no application to a proposed Constitutional Amendment. ·This
is the only provision in the ·organic law except section thirty
of Article three, which confers upon the Governor authority
to sign or veto a bill.　If a proposal to amend the Constitu-
tion is not embraced by either of those sections, then Article
14 is unaffected by them; and as its terms do not include
the Governor he has no power to approve or veto a measure
propounded under it.　The right which the Governor has to
sign·or to veto is strictly confined to *bills* which when signed,
or if vetoed, when passed by the requisite vote over the veto,
become *laws*.　Hence, the test as to whether a particular
measure adopted by the General Assembly is one which the
Governor must sign to give it efficacy, is the fact that when
signed it becomes, at once and in virtue of being signed, a
*law* and thereupon ceases to be a *bill*. . "Every *bill* * * *
shall, before it becomes a *law*, be presented to the Governor,
etc.''　If he sign it, it will become a *law*.　If he does not
approve it, and the two houses pass it by a three-fifths vote
over his veto it will also· become a *law*.　Obviously, then, the
measures which the Governor has the authority to sign or
veto, are only such as when signed, or when. passed· over his
veto become. *laws*.　A bill proposing an amendment to the

Constitution and nothing more, would *not* become a *law* if signed by the Governor nor would it become a *law* if passed by three-fifths vote over his veto; because it is required to be submitted to the people for *their* adoption or rejection; and not until it shall appear that a majority of the votes cast at the polls on such proposed amendment are in favor thereof can the Governor proclaim that it has been "adopted by the *people* of Maryland as *part of the Constitution.*" It is not operative unless adopted by the *people*—it is a mere proposal to amend until sanctioned by them; and when adopted by *their* votes it becomes, not a *law* in the sense in which that word is used in the Constitution, but a *"part of the Constitution."* To hold otherwise would lead to an anomalous situation, for if the bill proposing an amendment must be signed by the Governor before being submitted to a vote of the people, then the moment it is signed by him, it becomes, under *sec. 17, Art. 2,* a *law* with all the incidents and consequences which that term carries and conveys, notwithstanding the fact that it is wholly inoperative as a law or in any other way unless and until *adopted* by the people.

The people are the source of power. It is *they* who make and abrogate written constitutions, and when in the organic law which they have chosen for themselves they have designated the General Assembly, consisting of a Senate and a House of Delegates and nothing more, to be the agency for propounding amendments to the Constitution; no Executive has the right to step in between that agency and the people themselves and to say that without *his* approval *they* shall not be permitted to express *their* views on measures amendatory of the organic law. Unless the express language of the Constitution has unequivocally clothed the Governor with such an authority, in relation to proposed Constitutional Amendments, as is the case in Delaware, but in no other State, it cannot be borrowed from some other provision pertaining to a wholly different subject. Whilst the Governor is entrusted with power to protect the people against hasty *legislation*, he is not given a prerogative to guard them against *themselves* in

the matter of amending the organic law.    He is not superior
to them.    It is *their* will which *he* must obey—it is not *his*
will which *they* must subserve.

Article 14 is a separate and distinct sub-division of the
Constitution.    It deals, in its first section, exclusively with the
process of amending the Constitution and has no relation
whatever to legislation.    The other provisions in other arti-
cles to which allusion has been made are confined to *law*
making—this article is restricted to *Constitution* making; and
the two subjects are widely disconnected in location and in
substance.

The fact that other amendments heretofore propounded
have been submitted to and have been signed by the Gov-
ernor is of no weight in translating the provisions of the Con-
stitution.    As already stated, prior to the Constitution of
1851, every amendment was made under *Art. 59 of the Con-
stitution of 1776* by an Act of Assembly which, under *Art. 60*,
the Governor was obliged to sign.    No amendments were
made to the Constitution of 1851 but it was abrogated in 1864.
The Constitution of 1864 was superseded by that of 1867.
The first amendment of the latter was in 1874.    Between the
date of the last amendment of the Constitution of 1776 and
the year 1874 no amendments had been adopted, and though
the method of amending had in the interim undergone mate-
rial changes, it was not at all strange that the practice of hav-
ing the Governor sign the bill, as he had been required to do
under the Constitution of 1776, should have been continued
under the Constitution of 1867, especially as no question was
ever raised in regard to the matter, and his signature, being a
nugatory act, could do no harm.

In every jurisdiction, where the right of the President of the
United States and of the Governor of a State to sign or to
veto a proposed constitutional amendment has been drawn in
question, the Court's have, without a single exception, denied
the existence of such a right.    By the second paragraph of
*sec. 7, Art. 1*, of the Federal Constitution it is provided that,
"Every bill which shall have passed the House of Represen-

tatives and the Senate, shall, before it becomes a law, be presented to the President of the United States; if he approve he shall sign it," and the section continues in practically the same terms as those contained in *sec. 17, Art. 2,* of the Maryland Constitution.    The concluding paragraph of *sec. 7* is in these words: "Every order, resolution or vote to which the concurrence of the Senate and House of Representatives may be necessary (except on a question of adjournment) shall be presented to the President of the United States; and before the same shall take effect, shall be approved by him, or being disapproved by him, shall be repassed by two-thirds of the Senate and House of Representatives, according to the rules and limitations prescribed in the case of a bill."   Art. 5 declares that "The Congress, whenever two-thirds of both houses shall deem it necessary, shall propose amendments to this Constitution, etc."    The Third Congress proposed to the States the Eleventh Amendment on September 5th, 1794, and on the 8th of January, 1798, the President in a message to Congress declared that the amendment had been ratified.   *Annotated Con. 28.*   By the amendment it was provided that the "Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another State, or by citizens or subjects of any foreign state."    In *Hollingsworth* v. *Virginia,* 3 Dall, 378, the question arose whether the Eleventh Amendment destroyed the jurisdiction of the Federal Courts in cases to which it applied and which were pending at the time of its adoption.    It was contended that the amendment had not been proposed in the form prescribed by the Constitution and was void.    It appeared that it had never been submitted to the President for his approval, and it was argued that it was inoperative because the Constitution declares that "every order, resolution or vote to which the concurrence of the Senate and House of Representatives may be necessary * * * shall be presented to the President * * * and before the same shall take effect, shall be approved by him, or being disapproved by him, shall be passed by two-

thirds of the Senate and House of Representatives." The Attorney-General, Mr. Lee, was about to reply to this argument when he was interrupted by MR. JUSTICE CHASE with this statement; "There can surely be no necessity to answer that argument. The negative of the President applies only to the ordinary cases of legislation. He has nothing to do with the proposition or adoption of amendments to the Constitution." On the following day the Supreme Court delivered a unanimous judgment that the amendment had been constitutionally adopted.

The Thirteenth Amendment to the Federal Constitution was by inadvertence submitted to the President, but when it was learned that this had been done a resolution was introduced in the Senate asserting that such presentation was improper and unnecessary and that it ought to be so declared in order that it might not thereafter be treated as a precedent. The late Mr. Reverdy Johnson strongly supported the resolution, which was adopted.

The precise question we are now discussing has been decided adversely to the contention of the Governor, by the Supreme Court of Pennsylvania in *Commonwealth, ex rel. Elkins* v. *Griest*, 196 Penn. 396; s. c., 50 L. R. A. 868; by the Supreme Court of Louisiana in *The State, ex rel. Morris* v. *Mason*, 43 La. An. 590; in Nebraska in the case of *Re Senate File 31*, 25 Neb. 864. See also *Green* v. *Welker*, 32 Miss. 650; *Keohler* v. *Hill*, 60 Ia. 543; *Hatch* v. *Stoneman*, 66 Cal. 632; *Jamison's Con. Conv.*, sec. 556 *et seq.*

The Pennsylvania and Louisiana cases are elaborate, full and exceedingly able discussions of the subject. In both of those cases the proposed amendment had been submitted to the Governor and had been vetoed, but had not been passed over the veto; and yet in each a *mandamus* was ordered to issue requiring the publication of the measures. Under the Constitution of Pennsylvania provision is made in Art. 18 for proposing amendments to the organic law. In the course of its luminous judgment the Supreme Court of that State in *196 Penn.* said: "It will be observed that the method of creat-

ing amendments to the Constitution is fully provided for by
this article of the existing Constitution.   It is a separate and
independent article, standing alone and entirely unconnected
with any other subject.   Nor does it contain any reference to
any other provision of the Constitution as being needed or to
be used in carrying out the particular work to which the 18th
Article is devoted.   It is a system entirely complete in itself;
requiring no extraneous aid either in matters of detail or of
general scope, to its effectual execution.   It is also necessary
to bear in mind the character of the work for which it pro-
vides.   It is Constitution making; it is a concentration of all
the power of the people in establishing organic law for the
Commonwealth; for it is provided by the article that, 'if such
amendment or amendments shall be approved by a majority
of those voting thereon, such amendment or amendments
shall become a part of the Constitution.'   It is not law mak-
ing, which is a distinct and separate function, but it is a spe-
cific exercise of the power of a people to make its Constitu-
tion."   The Court then proceeds to point out the successive
steps which must be taken in originating and perfecting an
amendment.   We again quote: "These are the several stages
in the proceedings to create an amendment.   A proposal of
the amendment in either house; an agreement to the same by
both houses; a publication thereof by the Secretary of the
Commonwealth; a second agreement by the two houses; a
second publication by the Secretary; a vote of the people,
which, if a majority vote favorably, causes the amendment to
become a part of the Constitution.   In the orderly and logical
sequence of such preceding facts, it follows, with apparently
an unanswerable certainty, that an amendment thus originated,
proceeded with, and terminated, becomes an integral part of
our State Constitution."   These observations are strikingly
apposite to the case at bar.   By Article 14 of our Constitu-
tion the following, *and no other*, requirements must be com-
plied with:   A proposal of an amendment by the General
Assembly in the form of a bill; its passage by three-fifths of
all the members elected to each house by a yea and nay vote

to be recorded on the journal; the entry of the proposed amendment on the journal; the publication of the bill by order of the Governor for an least three months before the next general election; a vote of the people, and if a majority of the votes cast thereon are favorable to its adoption, a proclamation by the Governor declaring the amendment to have been adopted, "and thenceforth said amendment or amendments shall be part of said Constitution." Not a word or a syllable is to be found in any of these provisions even suggesting that the Governor is entitled to participate, in any way, in formulating and proposing amendments to the Constitution.

In the *Louisiana case, supra,* it was contended in behalf of the Secretary of State, who had refused to publish the proposed amendment, that he was not obliged to publish it because it had never acquired the force and effect of law, inasmuch as it had been vetoed by the Governor and had failed to pass over the veto. In dealing with that proposition MR. JUSTICE WATKINS said—and upon this point the Court was unanimous: "It may be at once conceded that the proposed amendment *'never acquired the force and effect of law,* and never become operative as a *law* ; not, however, because the measure represented by House Bill 214 did not receive the sanction and approval of the Executive; not because it failed to pass over the veto, as required by the Constitution and laws of this State, as the respondent returns, but because the 256th Article of the Constitution declares that a proposition for the amendment of the Constitution shall be submitted to the electors for *their* approval or rejection, and if a majority voting on said amendment, shall approve and ratify the same, *then* such amendment *so approved and ratified shall constitute a part of the Constitution.* The proposed amendment is a *proposition merely,* until approved and ratified by the votes of a majority of the electors of the State, cast at an election for representatives; and when so approved and ratified it constitutes—*not a law*—but a part of the Constitution. It is perfectly manifest, then, that neither the signature of the Gov-

ernor approving the measure, nor the passage of the same by
a two-thirds of the respective houses of the General Assembly
could in any way affect it, in any manner or degree. Neither
the one nor the other could give the proposition the force and
effect of law." The Court then turned its attention to the
contention that Art. 73 of the Louisiana Constitution, which
combines the provisions contained in *sec. 30, Art. 3, and sec.
17, Art. 2,* of our Constitution, and that Art. 75, which is
almost a literal transcript of the third paragraph of *sec. 7, Art.
1,* of the Federal Constitution, conferred upon the Executive
the authority to veto the proposed amendment; and this is the
summary way in which it disposed of the matter: "Each of
these articles relates to the duties of the executive in respect
to his approval or disapproval of *ordinary* 'Acts of State,' or
resolves of the General Assembly in respect to their becoming
operative and effective as *laws without ratification by the elect-
ors.* But Article 256 of the same organic law, under the
heading 'Amendment and Revision of the Constitution,' con-
fides to the Executive but one trust and imposes upon him
but one duty. It says: ''The result of said election—that is,
the election at which a proposed constitutional amendment is
submitted to the electors for their ratification or rejection—
shall be made known by the proclamation of the Governor.
This delegation of a *single, specific* duty in respect to such
proposition would seem under ordinary rules of construction
to exclude every other   *   *   *   . Our conclusion is that
the signature of the Governor to the proposition for the
amendment to the Constitution under discussion is not re·
quired by the Constitution, and that his disapproval of it did
not affect its validity."

We need not prolong this opinion by further citations from
adjudged cases and we will now proceed to note and consider
the second or subordinate inquiry which in the outset we
stated would be dealt with later on. That inquiry is this :
Does the second section of the franchise amendment bill con-
tain distinct legislative provisions which to be effective require
the signature of the Governor? A majority of us are of opin-

ion that it *does not:* whilst all of us agrée that the second sec-
tion of the good roads amendment bill contains no provisions
needing the Governor's approval.

The second section of the franchise amendment bill is in
these words: "And be it further enacted, That the foregoing
section, hereby proposed as an amendment to the Constitu-
tion of this State, shall be, at the next general election for
members of the General Assembly to be held in this State,
submitted to the legal and qualified voters thereof for their
adoption or rejection, in pursuance of the directions contained
in Art. 14 of the Constitution, and at said election the vote on
said proposed amendment shall be by ballot, and upon each
ballot there shall be *written or* printed the words, "For *the*
Constitutional Amendment," or "Against *the* Constitutional
Amendment," as the voters shall elect; and immediately after
said election düe returns shall be made to the Governor of
the vote on said proposed amendment, as directed by the said
14th Article of the Constitution." Now, it cannot be pretended
that the clause directing the amendment to be submitted to
the legal and qualified voters of the State at the next general
election for members of the General Assembly, is distinctively
and essentially a legislative provision requiring the Governor's
approval, because it is precisely what Art. 14 prescribes shall
be done; and if the clause had been entirely omitted from the
section the Constitutional mandate would have been operative,
as it still is effective, in this particular.    Nor is the require-
ment that the vote on the proposed amendment shall be by
ballot a legislative enactment, because the Constitution · itself
in *sec. 1, Art. 1*, declares that "all elections shall be by ballot."
The direction that immediately after the election, due returns
shall be made to the Governor, is simply a repetition of the
terms of Art. 14, under which identically the same thing
would have been done if the section had been altogether silent
on the subject.    The phrase, "*as the voters shall elect*," refers,
not to the remote but to the immediate antecedent—not to
the "*written or printed*," but to the "For" *or* "Against"—be-
cause the voter has nothing to do with *making* the ballot, and,

therefore, it is impossible for *him* to *elect* whether words shall
be written or printed thereon.  Hence, of necessity, the
phrase must mean precisely that which is implied and included
in the equally comprehensive provisions of the general law;
unless it be assumed, either that the General Assembly pur-
posely intended to mislead and confuse the voters by inserting
a clause in conflict with the then existing general law; or, that
the General Assembly obviously designed to repeal the then
existing general law in this particular and to substitute a differ-
ent provision in its stead.  No middle or intermediate atti-
tude exists.  Either one or the other, or neither, of the two
alternatives just indicated must be accepted.  "Comity and a
proper respect for a co-ordinate branch of the government."
(*Mayor, &c.*, v. *Board, etc.*, 15 Md. 475), forbid the adoption
of an hypothesis which imputes to the General Assembly such
an unworthy motive as the first of the two alternatives in-
cludes; and that alternative must be rejected.  There was ob-
viously no intention to repeal the general law, because the
General Assembly in passing the good roads amendment con-
currently with the franchise amendment—they were both
adopted by the house on March tenth, 1904—expressly in-
voked and reaffirmed the general law; and it cannot with pro-
priety be said that as to one amendment the general law was
to govern, whilst as to the other a totally different system was
to prevail.  The specific affirmance of the general law in the
second section of the good roads amendment excludes the
idea that the General Assembly designed to repeal that law
by the second section of the franchise amendment, for it can-
not be presumed there was an intention to have two different
methods in operation at the same time.  Neither alternative
can, therefore, be invoked.  As the voters shall elect they will
vote *for or against* the amendment.  This is what the phrase
means and that is exactly in accord with what the Code pre-
scribes.  Sec. 56, Art. 33, Code of 1904 (*Acts of 1896, ch. 202,
sec. 51; 1901, ch. 2*), enacts; "If at any election there be a
constitutional question  *  *  *  to be submitted to the
popular vote, the said question shall be placed upon said bal-

lot in the form following : 'For Constitutional Amendment,' 'Against Constitutional Amendment,' * * * and said respective questions shall be placed in a column, as hereinbefore mentioned, so that the same shall form a parellelogram, or space where the voter may clearly indicate in the way hereinafter ( ? ) pointed out" [in *secs. 54 and 55, Code 1904*] *"whether he shall wish* to cast his ballot *for or against* the Constitutional Amendment * * *." As the voter shall *elect*, and whether he shall *wish*, are equivalent terms or expressions. *Secs. 54 and 55* declare: "Ballots shall be so *printed* as to give to each voter a clear opportunity to designate by a cross (X) in a square * * * at the right of each question * * * his answer to such questions." It is clear from this brief examination of some of the provisions of the general election laws that the phrase "as the voters shall elect" is identical in meaning and effect with the clause "whether he shall wish" just cited from the Code. Eliminating from the second section of the franchise amendment all the terms thus far considered, nothing remains but the direction contained in the words "and upon each ballot there shall be *written or* printed the words, 'For *the* Constitutional Amendment, or Against *the* Constitutional Amendment." Do these words, which we have italicised, embody such an unquestionable legislative enactment as to be inoperative without the Governor's approval; and do they defeat, by reason of the absence of that approval, the design of the General Assembly with respect to submitting the proposed amendment to the vote of the people? A majority of this Court answer that inquiry in the negative, and they thus answer it for the following reasons.

The departure, or apparent departure, in section two of the proposed franchise amendment, from the requirements of the general election law, is found in the words *"written or,"* and in the word *"the"* between "For" and "Constitutional," and the same word *"the"* between "Against" and "Constitutional," and finally in the word *"or"* between "Amendment" and "Against." "Upon each ballot there shall be *written or*

printed the words, etc." This is in the alternative. The language of *sec. 56, Art. 33, Code 1904,* which is a transcript of part of *sec. 51, Art. 33, Sup. to Code (Act of 1896, ch. 202,* and *Act of 1901, ch. 2),* is, "the said question shall be *placed* upon said ballot in the form following, etc." If *written* there it would be *placed* there; and if *printed* there it would be *placed* there. As the direction that there shall be written *or* printed on the ballot the words indicated, is in the alternative, the designated words cannot be *both* written *and* printed; and as in every instance in which since the adoption of the *Act of 1896, ch. 202,* and the prior *Act of 1890, ch. 538,* an amendment has been submitted and adopted, the question has been *placed* on the ballot by being *printed* thereon, notwithstanding the second sections of the various bills proposing amendments, contained the words *"written or printed," (1890, ch. 194; 1890, ch. 195; 1890, ch. 242; 1892, ch. 313; 1900, ch. 185; 1900, ch. 432; 1900, ch. 469),* it may be regarded as settled that the alternative method of placing the amendment on the ballot by *printing* is the appropriate one to follow; especially in view of the requirements of *sec. 54* and *sec. 55, Art. 33,* Code of 1904, to the effect that "a constitutional amendment * * * shall be *printed* in a separate column to follow immediately after the names of the candidates."

Surely the article *"the"* where it occurs in the phrases "For *the* Constitutional Amendment" and "Against *the* Constitutional Amendment," when the terms used in the general law are "For Constitutional Amendment," "Against Constitutional Amendment," can not be said to import such a distinct and obvious feature of legislation as to require the signature of the Governor to give the measure validity. The term "For *the* Constitutional Amendment" is identical with the term "For Constitutional Amendment." The disjunctive *"or"* where it occurs between the phrases "For the Constitutional Amendment" *or* "Against the Constitutional Amendment," simply means *and*—that is to say, *both* terms must be printed on the ballot. Prescinding from section two of the franchise amendment the provisions which the Constitution itself supplies; and

finding that there is in the remaining requirements of the section nothing that is not in accord and complete harmony with existing enactments contained in the Code, both now, and at the time the General Assembly proposed the amendments; there is, in reality, embodied in that second section nothing whatever which requires the signature or approval of the Governor; and the fact that he did not sign the bills cannot deprive the people of the right to vote for or against the proposed amendments.

Section two of the good roads amendment bill is in the following language: "And be it further enacted by the authority aforesaid, that the aforegoing section hereby proposed as an amendment to the Constitution shall be, at the next general election held in this State, submitted to the legal and qualified voters thereof for their adoption or rejection, in pursuance of the directions contained in Article 14 of the Constitution of this State, and at the said general election the vote on said proposed amendment to the Constitution shall be by ballot, and upon each ballot shall be printed the words: "For Constitutional Amendment" and "Against Constitutional Amendment," as now prescribed by law, and immediately after said election due return shall be made to the Governor, of the vote for and against said proposed Amendment as directed by said fourteenth Article of the Constitution." This phraseology is slightly different from that used in the other bill, but the legal import of it is the same. The two are substantially similar.

There is another view of the subject which was discussed at the Bar ard is considered in the briefs. And it is this: Article 14 not only gives the General Assembly, as defined in *sec. 1, Art. 3*, heretofore quoted, the sole and exclusive authority to propose amendments to the Constitution, but it further, and in equally emphatic terms, declares that the proposed "amendments shall be submitted *in a form to be prescribed by the General Assembly.*" Obviously this means, according to the contention of the appellee, that the same body which may propose amendments may also prescribe the *form*, that is the

method, in which they shall be submitted; and section two of the franchise amendment does nothing more than prescribe a form for the submission of the amendment to the vote of the people. But as the conclusion we have reached on the other branch of this feature of the controversy is decisive of the case, we do not deem it necessary to pass upon the contention last alluded to. We may add this observation, that had section two been wholly omitted, or if it were now stricken out, the Code would supply all the details and machinery needed to place the amendment on the official ballot at the next general election.

The conclusions we have reached are: First, that a proposal to amend the Constitution, pure and simple, does not need the approval of the Governor and that he has no authority to veto it. To this we all agree. Secondly, the majority of us hold that there is nothing in the second section of the franchise amendment requiring the Governor's approval. Thirdly, that the second section of the good roads amendment contains nothing needing the Governor's sanction. To this we all agree. Fourthly, that the order appealed against must be affirmed and that the *mandamus* must issue as prayed.

> *Order affirmed with costs above and*
> *below.*

(Decided March 23rd, 1905.)

Boyd, J., dissented and delivered the following opinion in which Pearce and Schmucker, JJ. concurred.

The opinion filed in this case by the Chief Judge relieves me of the necessity of discussing what is therein spoken of as "The primary and fundamental question," not only because I cannot add anything of importance to that very able opinion, but as the members of the Court are unanimous on that branch of the case, it would be useless to do so. As the decision of the majority settles the question concerning which some of us differed, as effectually as if the Court had been unanimous as to that, I would not do more than note my dissent, did I not deem it proper to state more fully and distinctly

the points on which we differed, and my reasons for the con-
clusion I reached.

What is called the "subordinate" inquiry is thus stated in
that opinion:     "Does the second section of the franchise
amendment bill contain distinct legislative provisions which, to
be effective, require the signature of the Governor?"   While I
may not confine myself strictly to an answer to that inquiry, it
is sufficiently comprehensive to indicate the main point upon
which we differed.   Of course I assume that the Chief Judge,
in the above inquiry, intended to include the other ways pro-
vided by the Constitution, by which a law may be enacted by
the Legislature without the signature of the Governor—pass-
ing it over his veto, or by the Governor's failure to act within
the time prescribed—as elsewhere referred to in his opinion.
I do not understand any one to deny that if a bill of the Gen-
eral Assembly proposing an amendment to the Constitution
contains provisions which can fairly be said to be legislation,
such provisions cannot be effective unless submitted to the
Governor.   All of the authorities on the subject that I am
aware of concur in that view, unless, of course, there be some
special provision in a constitution that would make it unnec-
essary, but any controversy about it has usually arisen from
the difference of opinions as to whether certain provisions
amount to legislation.

The title to this bill in question is "An Act to amend sec-
tion 1 of Article 1 of the Constitution of this State, *and to
provide for the submission of said amendment* to the qualified
voters of this State for adoption or rejection."   The latter
part was intended to follow the provisions of section 1 of Art.
14 of the Constitution which says "the bill, or bills, proposing
amendment, or amendments, shall be published by order of
the Governor   *   *   *   once a week for at least three
months preceding the next ensuing general election, at which
the said proposed amendment, or amendments, shall be sub-
mitted, *in a form to be prescribed by the General Assembly*, to
the qualified voters of the State for adoption or rejection."
In section 2 of this bill it is provided that the proposed

amendment be submitted at the next general election for members of the General Assembly and "at said election the vote on said proposed amendment shall be by ballot, and upon each ballot there shall be *written or printed* the words 'For the Constitutional Amendment,' *or* 'Against the Constitutional Amendment,' as the voters shall elect," (italics are mine). This bill passed the Senate on March 3rd and the House on March 10th, 1904. The other bill before us, known as the "Public Roads Amendment" passed the Senate on March 2nd and the House on March 10th, and in sec. 2 of that Act it was provided that the vote shall be by ballot," "and upon each ballot shall be *printed* the words, 'For Constitutional Amendment,' *and* 'Against Constitutional Amendment,' as now prescribed by law." It is impossible for me to understand how it can be said that the language thus used in these two bills is substantially similar. When the members of the Senate on two successive days (March 2 and 3) and the members of the House on the same day (March 10) solemnly enacted that in the one case there shall be *written or printed* upon each ballot " 'For the Constitutional Amendment,' *or* 'Against the Constitutional Amendment,' as the voters shall elect," and in the other there shall be *printed* upon each ballot "For Constitutional Amendment" *and* "Against Constitutional Amendment as now prescribed by law," they certainly did not prescribe the same form for submitting these amendments, if plain, unambiguous language is to be given its ordinary meaning. To say that *one of two* expressions shall be *written* or *printed* on each ballot, is the same thing as saying that *both* shall be *printed* on each ballot, would seem to be going very far under any circumstances, but the general laws of this State, relating to elections, show that the distinction is not one of mere words, but is regarded as one of substance and of great importance. Prior to the adoption in this State of what was called "The Australian Ballot," it was lawful to have on the ballot the names of candidates voted for, and the affirmative or negative vote on a constitutional amendment or other question submitted, either *written or printed.* A change was made by ch.

538 of Laws of 1890, applicable to Baltimore City and all but nine counties. By sec. 137 of that Act it was provided that "whenever a constitutional amendment or other question is submitted to the vote of the people, such question shall be *printed* upon the ballot after the list of candidates, with the words 'For' *or* 'Against' as each political party may determine." The cross-mark (X) was then adopted as the means of indicating the voter's choice. By ch. 236 of Laws of 1892 that law was made applicable to the whole State, and sec. 137 was amended, providing amongst other things that constitutional amendments should be placed in a column to the right of the ticket, with two boxes or squares placed in the margin, in the upper of which "shall be *printed* the word 'For' and in the lower of said squares or boxes the word 'Against.'" The Act of 1896, ch. 202, was then passed, making many changes, which was from time to time amended, and the general law now in force has various provisions, some of which I will refer to.

Sec. 53 of Art. 33 of Code (1904) requires the Board of Supervisors of Elections of each county and of the city of Baltimore to provide ballots, and amongst other provisions it says "Each ballot shall contain a statement of every constitutional amendment or other question to be submitted to the vote of the people at any election. Ballots other than those printed by the respective boards of supervisors of elections, according to the provisions of this article, *shall not be cast or counted* in any election, except as hereinafter provided. Nothing in this article contained shall prevent any voter from *writing* on his ballot and marking in the proper place the *name of any person* other then those already *printed* for whom he may desire to vote for any office, and such votes shall be counted the same as if the name of such person had been *printed* upon the ballot and marked by the voter."

Section 54, applicable to Baltimore City and twelve of the counties, provides that "A constitutional amendment, or any question to be submitted to the popular vote, shall be printed in a *separate column*, to follow immediately after the names of

candidates," and sec. 55, applicable to the other counties, that it "shall be printed in the *same column* with the names of the candidates." Section 56 requires "For Constitutional Amendment" and "Against Constitutional Amendment" to be placed on the ballot "so that the same shall form a parallelogram or space where the voter may clearly indicate, in the way hereinafter pointed out, whether he shall wish to cast his ballot for or against the constitutional amendment." Section 66 provides that the voter shall mark, with an indelible pencil, "in the appropriate space, a cross-mark (X) against the answer which he desires to give," and sec. 71 that "If the voter has marked more names than there are persons to be elected to an office, *or if there shall be any mark on the ballot other than the cross-mark in the square opposite to the name of a candidate, or other than the name or names of any candidate written* by the voter on the ballot, as provided in sec. 53, *his ballot shall not be counted.*"

Without referring to other provisions, it will be seen from the above that the election laws of this State require official ballots to be furnished, on which shall be *printed* the names of candidates and Constitutional Amendments and other questions to be submitted, and that they shall be so prepared as to enable the voter to place a cross-mark in the space or square opposite the names of candidates and opposite the "For" or "Against" the Constitutional Amendment, as he may elect. The *only writing* permitted is the name or names of some person or persons *other than those printed* on the ballot, and, with that exception, *any mark other than the cross-mark requires the ballot to be rejected,* as is expressly stated in the statute, and held by this Court in *Duvall* v. *Miller,* 94 Md. 697, and *Coulehan* v. *White,* 95 Md. 703. This bill does not authorize placing on the ballot "For the Constitutional Amendment" *and* "Against the Constitutional Amendment," but only the one *or* the other, "as the voter shall elect," and it authorizes that *one* to be *written or printed,* while the general law invalidates the whole ballot if either be *written* on it. As the proposed "Public Roads Amendment" provides that it shall be sub-

mitted "as now prescribed by law"—that is to say, under the General Laws—and we have seen how utterly at variance those laws are with the form proposed by this bill, in some of the most material provisions, I am unable to agree with the majority that "the two are substantially similar." One in effect says that *one* may be *written or printed*, the other that the *two* shall be *printed* and if either is *written* the ballot shall be void. Can provisions affecting ballots well be more *dissimilar* in their results? It seems therefore to me that the two houses of the General Assembly not only did not use language that authorizes the construction of the majority, but it must in justice to the members of the General Assembly be assumed that they did not intend this bill to be submitted on the ballot prepared under the general laws, *unless* they also intended to repeal the general laws, in so far as they conflicted with this bill. That they could not do that without submitting it to the Governor, and having his approval or what the Constitution makes equivalent to that, seems to me to be beyond all possible doubt, and indeed I do not understand the majority of the Court to hold the contrary. For conceding that the two houses of the General Assembly have the power to prescribe the "form" in which a proposed amendment shall be submitted, surely it cannot be said that they can so far change the General Laws as to authorize placing on the ballots provided for by those laws anything directly contrary to their provisions, without either obtaining the approval of the Governor for such change, or passing the bill over his veto. In short, *a law* can only be repealed by *a law*, and the two houses of the General Assembly themselves admittedly cannot pass *a law*, but must submit it to the Governor.

The title to this bill quoted above referred to the Act as one to amend sec. 1 of Art. 1 of the Constitution, "and *to provide for the submission of the said amendment* to the qualified voters of this State for adoption or rejection," and the title to the other bill before us is only "An Act to amend section thirty-four of Article three of the Constitution of this State." The latter seems to be the form of title usually

adopted in this State, for out of the seven Acts submitting
amendments referred to in the majority opinion, only one
of them (1900, ch. 185), used the form adopted in the elective
franchise bill.    Whether there was any special reason for the
difference I do not know, but certain it is that this title gave
special notice to the members of the General Assembly that
the bill not only proposed to amend this section of the Con-
stitution, but to provide for the submission of it to the voters,
and when it did provide that "upon each ballot there shall be
*written or printed* the words 'For the Constitutional Amend-
ment,' *or* 'Against the Constitutional Amendment,' as the
voters shall elect," upon what authority can this Court strike
out the words *"written or ?"*  If the bill had been submitted to
the Governor, and he had approved it, could a ballot have
been thrown out beuause a voter wrote "For the Constitu-
tional Amendment" or "Against" it, instead of relying on a
cross-mark?   Upon what grounds could it have been done?
The theory of the appellee is that the two houses of the Gen-
eral Assembly, by virtue of Art. 14 of the Constitution, have
the power to propose an amendment and to submit it "in a
form to be prescribed by the General Assembly."  As they said
the choice of the voter could be *written or printed,* if the Gov-
ernor had approved the Act it would have been *to that extent* a re-
peal of the provisions of the General Laws, prohibiting writing the
voter's choice on the ballot to be provided at the next Novem-
ber election, and I can see no reason why it would then have
invalidated a ballot to have thus written the voter's choice on
the question.    But in order to do that it required legislation—
the action of the Legislature and Governor—and that is pre-
cisely what this part of sec. 2 of this bill was apparently in-
tended to be when it was passed.

The majority of the Court eliminate the words *"written or,"*
as  indeed they were required to be in order to place the in-
terpretation on the bill given it by them.    Of course after that
is done, the words "as the voters shall elect" can well be con-
fined to the "For" or "Against,"—but if the words used by
the  General  Assembly—*"written or printed"*—are  given any

consideration, the voter not only had the right to elect which he would vote for, but also which óf the two ways he would vote, as the General Assembly had authorized him to do. The form of this bill, especially when taken in connection with the universal practice of submitting bills proposing amendments to the Governor, which had prevailed since the adoption of the present Constitution, makes it reasonably certain that it was intended to submit this to the Governor when it was introduced, and when it was passed, and, although I agree with the rest of the Court that it was not necessary to do that in order to submit the proposed amendment to the people, still when it was determined not to send the bill to the Governor, it should have been put in such shape as the two houses of the General Assembly were authorized to adopt. The Public Roads Amendment was so drawn as to have it submitted under the General Laws and if such was the intention of the General Assembly, this bill could likewise have been so submitted, but they did not follow that plan. Of course none of us supposed that the use of the article "the"—"For *the* Constitutional Amendment," etc.,—could affect the question, but I am not prepared to agree with the majority when they say "or" means "and" in the connection in which it is used, although I do not deem it necessary to say more on that subject.

It was argued with great force by the attorneys for the appellee that inasmuch as the Constitution provides that a proposed amendment is to be submitted *"in a form to be prescribed by* the General Assembly," the same body which can propose amendments can also prescribe the "form." The majority opinion does not base its conclusions on that ground and it seems to me that it is clear that this bill cannot be sustained on that theory. For conceding that to be authorized by the Constitution, still if the General Assembly adopts a "form" which cannot be used on the ballots provided for under the General Laws, without repealing the provisions of those laws applicable to those ballots, there must be legislation to enable that to be done. Under the existing General Laws, as we

have seen, there can be no writing on the ballot, excepting such as we have indicated, and if any voter does put any other writing on his ballot it would invalidate the whole ballot. Surely the framers of the Constitution never intended to give the two houses of the General Assembly such power as that. The officers of election appointed under the general laws are sworn to support those laws, and could not count a ballot which had any writing on it not authorized *by law*. When I speak of repealing the provisions of the general laws, I do not mean to repeal them absolutely, so that they can no longer be of effect, but only in so far as necessary to make the changes on the ballot to be used at the election at which such amendment is to be submitted.

If it be conceded that the provision of the Constitution above mentioned would authorize the General Assembly to provide that the amendment be submitted on separate ballots, that would not meet the difficulty, for no machinery has been provided for such submission—neither ballots, ballot-boxes, nor officers of election are provided for at the election to be held in November next, excepting such as the General Laws authorize, and of course the ballots and the ballot-boxes must be such as those laws authorize and the election of officers appointed under those laws must be governed by them and not by a *bill* in conflict with them which did not become a *law*. Or if it be conceded that sec. 2 might have been omitted altogether (which would be going quite far) and that the General Laws would then determine the method of submitting the proposed amendment, the simple answer to that is that the General Assembly did not see proper to adopt that plan, but on the contrary did include sec. 2 and did undertake to prescribe a different form in which this amendment should be submitted. And having passed sec. 2 with sec. 1, I cannot understand how this Court can reject that, or, as suggested in the majority opinion, strike it out, with any more propriety than it could sec. 1. As the Constitution provides that the proposed amendment shall be submitted "in a form to be prescribed by the General Assembly," and as the General Assembly did

attempt to prescribe the form, it does seem to me that this
Court is getting on dangerous ground when it says, as it in
effect does by the decision in this case, that although the
Constitution says that the General Assembly (*not the Court*)
shall prescribe the form, still as it has prescribed one which
cannot be carried out under existing laws, this amendment can
be submitted in a form different from that the General Assem-
bly prescribed.    With great respect for the opinion of those
that differ with me it does seem to me that such course results
in not only submitting a proposed amendment without the
action of the Governor, but in so far as the method of sub-
mitting it, without the authority of the General Assembly, or
to speak more accurately, *contrary to its intention, plainly ex-
pressed.*

I cannot be influenced by the argument that the form used
in this bill is the same as that generally heretofore adopted in
submitting proposed amendments to the Constitution—even
since the present election laws have been in force.    For, as I
have already said, every one of them had the signature of the
Governor attached, and thereby removed all questions as to
whether the bills proposing those amendments embraced leg-
islation, for, if they did, they were adopted in accordance with
the constitutional provisions which must be followed in order
to enact laws.    They could therefore be construed to author-
ize the change of the General Laws to the extent necessary
to place such forms on the ballot prepared under the General
Laws.    But beyond that, no question was raised in the Courts
as to them, and the question was therefore never passed on.
If some voter had written "For" or "Against the Constitu-
tional Amendment" as he elected, on the ballot, and the ques-
tion had been raised whether that was valid, or whether it
invalidated his ballot, the Courts could have been called on
to determine it, but as no such question was ever raised, so
far as I am aware, it has never been heretofore decided.

The form used in this and other bills seems to have been
taken from the provision in the Constitution of 1867, submit-
ting it to the people.    It was there said "At the said election

the vote shall be by ballot, and upon each ballot there shall be written or printed the words 'For the Constitution' or 'Against the Constitution,' as the voter may elect." At that time, and for over twenty years afterwards, there was no official ballot provided, and the voter could cast a ballot upon which there was either *written or printed* his choice as to candidates and questions submitted. No one can doubt that the framers of the Constitution meant what they said, when they provided that when the Constitution was voted on, there should be *written or printed* the words "For the Constitution" or "Against the Constitution,' as the voter may elect," and when the General Assembly said in this bill *"written or printed'* why should we say they only meant *printed ?* Surely we are not authorized to reach that conclusion merely because they have not provided the means for using the *"wirtten"*— especially as it is perfectly manifest that when they passed the bill they expected to submit it to the Governor and thus authorize the choice of the voter to be either *written* or *printed*.

It is scarcely necessary to add that the action of the General Assembly is not self-executing. The case of *Monroe* v. *Wells,* 83 Md. 505, would seem to settle that question. There the election of Clerk of the Circuit Court was contested, and decided against Dr. Wells by the House of Delegates, which under sec. 12 of Art. 4 of the Constitution heard the contest, and, having determined it against him, ordered a new election within thirty days, as required by that section. But inasmuch as the new election law had repealed the former one, in such way as to make it "absolutely inoperative for any purposes whatever," and as the former election officers did not hold over, and the new officers did not go into office until after the time fixed for the special election, there was no machinery by which it could be held, and we said "That the order of the House of Delegates, although in accordance with the Constitution, was not self-executing, but required affirmative legislation in order to be carried out, since the special election could not be held without registration, supervisors, judges or ballot-boxes provided for by a statute in force." The result

was there could be no special election as required by the Constitution, because the machinery for holding it had not been provided. So in this case, as the General Assembly has attempted to submit this amendment in a way that in my opinion could not be done under our existing election laws, and did not provide the machinery for submitting it in the form prescribed by them, I thought it could not be submitted. For these reasons I was unable to agree with the. majority of the. Court as to the effect of sec. 2 of this bill.

I am authorized to say that Judges PEARCE and SCHMUCKER concur in this opinion.

(Filed April 5th, 1905.)